R. P. Farnsworth & Co., Inc. v. Commissioner.
R. P. Farnsworth & Co. v. Commissioner
Docket No. 21934.
United States Tax Court
1951 Tax Ct. Memo LEXIS 18; 10 T.C.M. (CCH) 1181; T.C.M. (RIA) 51354; December 17, 1951
*18 R. Emmett Kerrigan, Esq., and Marian Mayer, Esq., for the petitioner. F. S. Gettle, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent has determined deficiencies in income tax, declared value excess profits tax, and excess profits tax for the years 1942, 1943, and 1944 as follows: Declared
Income
Value Excess
Excess
Year
Tax
Profits Tax
Profits Tax
1942
$158.50
$53,978.05
1943
.10
$13,283.51
69,879.19
1944
46,180.35
The chief issue is whether the amounts of the salaries which the petitioner paid to its seven executives, some of whom are officers and directors of the petitioner and all of whom are stockholders, for services rendered in the four years 1942, 1943, 1944, and 1945 are reasonable allowances for compensation which are deductible under section 23 (a) (1) (A) of the Code. The petitioner sustained a net operating loss for the year 1945 and is entitled to a loss carry-back to the year 1943 under section 122. The respondent has reduced the amount of the net operating loss for 1945 which results in a corresponding reduction of the amount of the loss carry-back deduction in 1943. The reduction in the amount of the 1945 net operating loss results *19 from the respondent's determination that parts of the amounts of the salaries paid to the seven executives in 1945 are not deductible under section 23 (a) (1) (A). This determination places in issue the question of what amounts are reasonable allowances for compensation for the services rendered in 1945, although no deficiencies in tax have been determined for 1945. The second issue arises under section 23 (p) and relates only to the years 1943 and 1944. The respondent has disallowed petitioner's contributions in 1943 and 1944, which were paid for the benefit of the seven executives in question to a pension trust fund established for employees, including the seven executives. The payments were in the form of insurance premiums. The respondent has determined that the amounts so paid do not meet the test of reasonableness set forth in section 23 (a) (1) (A) for purposes of deduction under section 23 (p) (1). The contributions of the petitioner to the pension trust were nonforfeitable, and section 23 (p) (1) (D) is applicable. The petitioner agrees that other various adjustments in the amounts of taxable income for some of the years involved have been made correctly by the respondent. *20 Under Rule 50, effect will be given to those adjustments. The petitioner filed its income, declared value excess profits tax, and excess profits tax returns with the collector for the district of Louisiana. The petitioner introduced and filed in evidence in this proceeding the entire record of a proceeding in this Court involving its tax liability for the year 1941, which was decided under a Memorandum Findings of Fact and Opinion entered on March 5, 1947, . The issue presented in that proceeding related to the amounts of reasonable allowances for compensation for the services rendered in 1941 by the same seven executives of the petitioner who are involved in this proceeding. The evidence adduced in this proceeding which relates to the years 1942 to 1945, inclusive, consists of extensive testimony and exhibits, and a stipulation of facts. Findings of Fact The facts which have been stipulated are found as facts. The stipulation is incorporated herein by this reference. The petitioner, a Delaware corporation, was organized in 1935. It has its principal place of business at New Orleans, Louisiana. It is engaged in the business *21 of general contracting and construction. The business was carried on as a partnership prior to the organization of the petitioner and was founded in 1887 by R. P. Farnsworth, deceased. The books of account of the petitioner are kept on a completed contract basis and on an accrual basis. The officers and chief executives of the petitioner during the years 1942 to 1945, inclusive, were the following: President
O. J. Farnsworth
Vice President
George S. Farnsworth
Vice President
Richard A. Farnsworth
Secretary-Treasurer
S. K. Manson
Ass't to the President
L. K. Good
General Superintendent
D. N. Chambers
General Superintendent
H. Pratt Farnsworth All of the foregoing executives were directors of the petitioner, except H. Pratt Farnsworth, and constituted the board of directors during the years here involved. All of the foregoing executives owned all of the petitioner's common stock, in varying amounts, during the years 1942 to 1945. With the exception of H. Pratt Farnswrth, t8ey owned all of the outstanding 6 per cent preferred debenture stock during the years 1942 to 1944, inclusive. With the exception of H. Pratt and Richard Farnsworth, they owned all of the preferred debenture stock which was outstanding *22 in 1945. On July 28, 1942, the petitioner executed a pension trust agreement with the Hibernia National Bank of New Orleans, trustee, for the benefit of some of its employees. The petitioner purchased endowment annuity contracts for the benefit of the employees covered by the pension plan which were deposited with the trustee. Under the pension plan, the petitioner agreed to pay the premiums on the annuity contracts as long as the pension plan remained in existence. An annuity contract was purchased for each of the employees covered by the pension plan. Petitioner's payments of the premiums on the annuity contracts constituted its contributions to the pension fund. Petitioner's contributions to the pension fund were nonforfeitable. During 1943 the pension plan covered sixteen of petitioner's employees, and fifteen were covered in 1944. No contributions were made to the fund in 1945. In both years, the above-named seven executives of the petitioner were included under the pension plan, and the petitioner paid the premiums in 1943 and 1944 on the annuity contracts of which they were beneficiaries in the amounts which are set forth below. The respondent allowed deductions in 1943 and *23 1944 for the premiums paid by the petitioner on the contracts for the benefit of all employees covered by the plan except for the premiums paid for the seven chief executives, deductions for which have been disallowed: Annuity Contract Premiums * Paid - Deduction Denied Executive
1943
1944
Executive
1943
1944
O. Farnsworth
$ 4,007
$ 4,007
D. Chambers
1,333
1,134
G. Farnsworth
1,468
1,470
H. Farnsworth
1,469
1,479
R. Farnsworth
1,737
1,738
S. Manson
1,705
1,717
Totals
$13,040
$12,868
L. Good
1,321
1,323
The salaries paid to the seven executives during 1941, during 1942-1944, and during 1945 are set forth in the following schedule. The same salaries were paid during 1942, 1943, and 1944. Salaries Paid
Salaries Paid *
Salaries Paid
Executive
1941
1942-1944
1945
O. Farnsworth, Pres.
$ 30,000
$ 45,000
$ 35,000
G. Farnsworth, Vice Pres.
29,000
42,000
33,333
R. Farnsworth, Vice Pres.
29,000
42,000
33,333
S. Manson, Sec.-Treas.
21,000
30,000
24,000
L. Good, Asst. to Pres.
21,750
33,000
25,500
D. Chambers, Sup't.
21,750
36,000
27,333
H. Farnsworth, Sup't.
12,900
18,000
16,000
Totals
$165,400
$246,000
$194,499
The combined amounts which the petitioner paid in 1943 and *24 1944 as salaries and as pension fund contributions for each of the seven executives are as follows: 1943
1944
Executive
Salary paid
Premium
Total
Salary paid
Premium
Total
O. Farnsworth
$ 45,000
$ 4,007
$ 49,007
$ 45,000
$ 4,007
$ 49,007
G. Farnsworth
42,000
1,468
43,468
42,000
1,470
43,470
R. Farnsworth
42,000
1,737
43,737
42,000
1,738
43,738
S. Manson
30,000
1,705
31,705
30,000
1,717
31,717
L. Good
33,000
1,321
34,321
33,000
1,323
34,323
D. Chambers
36,000
1,333
37,333
36,000
1,134
37,134
H. Farnsworth
18,000
1,469
19,469
18,000
1,479
19,479
$246,000
$13,040
$259,040
$246,000
$12,868
$258,868 The respondent has determined, for purpose of deduction, that a reasonable allowance for the compensation of each executive for services rendered in each of the taxable years is as follows: 1942-1943-1944
1945
Salary
Salary
Salary
Salary
Name of Executive
Allowed
Disallowed
Allowed
Disallowed
O. Farnsworth
$ 33,500
$11,500
$ 31,000
$ 4,000
G. Farnsworth
32,000
10,000
29,000
* 4,333
R. Farnsworth
32,000
10,000
29,000
* 4,333
S. Manson
23,500
6,500
21,000
3,000
L. Good
24,000
9,000
24,000
1,500
D. Chambers
24,000
12,000
22,000
* 5,333
H. Farnsworth
16,000
2,000
14,000
2,000
$185,000
$61,000
$170,000
* $24,499
The petitioner is, and has been for some time, the largest concern engaged in *25 the general contracting business in Louisiana. The organization of petitioner's management and methods of doing business antedate its corporate organization in 1935, when an established contracting business which had been developed by the members of the Farnsworth family and had been carried on as a partnership, was incorporated. The [backgrounds] of the seven executives of the petitioner is [are] as follows: O. J. Farnsworth has served as petitioner's president since 1937 when he succeeded his father. He has been engaged in the construction business for about 35 years, since 1907, is the senior executive, and provides the balancing and decisive judgment in the business. George S. Farnsworth studied civil engineering. He became a member of the predecessor partnership in 1927. He was trained in the various phases of the construction business by his father and older brothers, and in his early years worked as a bricklayer, a carpenter, a foreman in excavation, concrete, and masonry, and carpentry, and as a superintendent. He has studied all of the operations of the contracting and construction business, and is a specialist in concrete form work. He has had about nineteen years' experience *26 in the business, since before 1925. He became a vice-president of the petitioner in 1937; he held that office during the taxable years; and he became president in 1948, succeeding O. J. Farnsworth who became chairman of petitioner's board of directors in that year. Richard Farnsworth studied architecture. He was trained in the construction business by his father and his brother, H. P. Farnsworth, beginning in 1921, when he started by learning the bricklayer's trade. He served as superintendent of projects as early as 1928. He had had about twenty years' experience in the business of the petitioner and its predecessor by 1942. He became a member of the Farnsworth partnership in 1927 when George became a partner. He became a vice-president of the petitioner in 1935 and held that office during the taxable years. He is a specialist in construction machinery and its uses, and in cost accounting in the construction industry. He caused the adoption of a cost accounting system in petitioner's business. He has been influential in the selection of petitioner's personnel. He has contributed to the adoption of progressive policies in the business. He recommended the policy of owning machinery *27 and equipment, which petitioner adopted. He has had the general supervision of large construction projects. He brought Dunbar Chambers into the business and trained him in the business. S. K. Manson has been associated with the foregoing executives since 1923 when he began working for the partnership as a bookkeeper. His experience in the petitioner's business had extended over about nineteen years up to 1942. He has served as secretary-treasurer of the business since 1923, and he has had the control and supervision of all accounting since 1927, and he has served as credit manager also. In general his services have comprised looking after accounting, credit, insurance, taxes, sub-contractors' credit standing, surety bonds, the financial and fiscal aspects of the business of the petitioner and its predecessor partnership business, checking purchases of materials, paying bills, and making up large payrolls. He died in 1949. Louis K. Good is a licensed civil engineer, a graduate of Tulane University's School of Engineering. Up to 1942, he had had about seventeen years' experience in the construction business. He was first employed in 1929 by the partnership which preceded the petitioner. *28 He was trained by O. J., George, and Richard Farnsworth and has worked closely with them since 1929, during a period of thirteen years up to 1942. He has done estimating work since 1927, including the assembling of estimates for jobs, and he has participated in bidding and the assembling of bids since about 1927. Since about 1932 he has handled buying for the business. He became a stockholder and director of the petitioner in 1937. He is not related to the Farnsworth family by blood or marriage. Since 1937 he has participated in all of the bidding of the petitioner and in the assembling of bids which has involved traveling to locations of projects and making surveys of the sites; he has handled correspondence and coordination of shop drawings and details between the petitioner and sub-contractors and architects and, in general, co-ordinated work. He has handled, also, the letting of sub-contracts and the obtaining of bids from sub-contractors. He knows the various crafts involved in construction work, materials, and values of materials. Good was an administrative assistant to petitioner's president, O. J. Farnsworth. Dunbar N. Chambers became an employee of the petitioner's predecessor *29 in 1925 as a time-keeper under Richard Farnsworth's supervision. He has studied engineering. Up to 1942 he had had seventeen years' experience in building construction. His experience includes the building crafts of reinforcing steel, pouring concrete, driving piles, masonry and stonesetting, and excavation. By 1931 he had become a brick superintendent and a general labor foreman. In 1937 he became one of petitioner's stockholders and a director. In 1937 he was a co-superintendent with George Farnsworth of the construction of Charity Hospital which cost $14,000,000, which cost included foundation work amounting to $750,000. In 1941 he became the general superintendent of the Lafitte Housing project, Jackson Barracks, and the Moss Street Housing project. Chambers is not related to the Farnsworth family. H. Pratt Farnsworth was associated with petitioner's predecessor from 1907 to 1926 when he left to organize his own contracting business which he carried on until 1937. He had had about 35 years experience in the building contracting business up to 1942. He has been associated with the petitioner since 1937. He was considered less skilled in building contracting work than his brothers, *30 and had not been as successful in his own business as they had been. He did not handle large construction work prior to 1941. Prior to 1942 he had less responsibility in the business than his brothers. He did not become a member of the board until 1942. In 1941 he was general superintendent of the masonry work of the Lafitte Housing project, and, also, was superintendent of Tulane Library and the Louisiana Shipyard work. The seven chief executives of the petitioner owned shares of petitioner's stock during the taxable years as follows: 1942
1943-1944
1945
Common
Deb.
Common
Deb.
Common
Deb.
O. Farnsworth
345
650
320
800
339
490
G. Farnsworth
345
380
320
500
339
490
R. Farnsworth
345
300
320
400
339
0
S. Manson
234
120
234
200
248
200
L. Good
234
120
234
200
248
200
D. Chambers
267
80
267
180
283
180
H. Farnsworth
103
0
178
0
189
0
Totals
1873
1650
1873
2330
1985
1560
The seven chief executives of the petitioner are the key executives, and they constituted during the taxable years, and before, a well co-ordinated team in the active conduct of all of the business of the petitioner. They were responsible for the growth and the success of the business of the petitioner. Although they have assistants, they are assisted by men in subordinate positions, *31 who have inferior capacities and abilities. During the taxable years, O. J. Farnsworth was the general manager of the business; George, Richard, and H. Pratt Farnsworth and Chambers were supervisors or general superintendents of construction projects, and Manson and Good performed administrative work, chiefly in the office of the petitioner. All seven men directly and actively participated in the performance and direction of the construction contracts which were completed in the taxable years, and in the contact work, site work, pricing and bidding for contracts. They ran the business, carried the responsibility and risk, obtained the business, and handled the execution thereof to completion. The first six of the group were experts in their respective fields of work and had had long experience. Although not as capable or enterprising as the others, H. Pratt Farnsworth was a capable man. The seven key executives of the petitioner operated its business under a system which enabled the petitioner to establish the reputation of being a low bidder in many instances and capable of financing and performing a very large volume of work. The system of operation involved the ability and capacity *32 to perform practically all of the work in the chief craft divisions of the building construction business rather than sub-contracting major divisions of the work. That is to say, the petitioner did its own excavating, pile driving, cement form work, concrete pouring, masonry and brickwork, dirt and paving work, and in some instances the landscaping work. The petitioner is the only general building contractor in its vicinity which does practically all of the work required under construction contracts. On the whole, the only work which the petitioner sub-contracts is specialty work such as plumbing, plastering, electrical work, and heating. It also owns machinery required for the various branches of work done. It operates with union labor. However, incident to the performance of the several types of work which is done by the petitioner are the risks and hazards of operating in the several branches of construction work, the risks of purchasing materials, and the risks of pricing and bidding. Errors in judgment can result in losses. The petitioner's business, on the whole, comprises two large divisions - estimating and bidding, and the work of construction under contracts. During the taxable *33 years the efforts of the chief executives of the petitioner, excluding Manson, were devoted to both the preparation of bids for work and the construction work performed in the performance of contracts received upon successful bids. The preparation of bids was, of course, the method of getting new business. There was competition in getting new business during the taxable years, and the officers of the petitioner prepared and filed a great many bids which were not successful. The amount of bidding done in each of the taxable years, the numbers of bids which were successful, and those which were not successful are set forth hereinafter. During 1942, 1943, and the early part of 1944, the petitioner operated its business in one office only, in New Orleans; but in May of 1944 a second office was opened in Houston, Texas, by Richard Farnsworth and Dunbar Chambers, and was managed by them. Thereafter Richard Farnsworth and Chambers did all of the work in preparing the bids made by the Houston office, and they participated in the preparation of bids made by the New Orleans office less than they had done before. The petitioner reports income on a completed contract basis. Under this method of *34 reporting income, the amounts of gross receipts from work done do not reflect work which is not completed within a taxable year, and the income reported for a year reflects work which was bid successfully and commenced in a prior year. Also, the income reported does not reflect the work done under bids successfully made during the taxable year which is completed in a later year. It follows, therefore, that a complete picture of the work done in a taxable year by each of the chief executives of the petitioner must include reference to all of the bidding, both successful and unsuccessful, in a taxable year, and the work commenced but not completed in a taxable year. Several steps are taken in bidding for new business, all of which require time, effort, skill, experience, and the use of judgment. Errors in judgment, in estimating, in pricing, in analyzing competition, and in forecasting profit on a job can result in losses. The steps which were followed by the six chief executives who participated in the preparation of bids for new work were, in the taxable years, as follows: (1) Locating contemplated construction projects through contacts and investigation; (2) Obtaining consent of those *35 letting out contracts to bid upon presentation of evidence of qualifications to perform work under contemplated contracts; (3) Upon obtaining consent to participate in bidding, contacting sub-contractors, material men, and, in the taxable years, government agencies exercising controls and regulatory powers; (4) Building the job on paper from drawings, specifications, and plans and making estimates of the amounts and costs of materials, labor, and so forth required; (5) Checking and double-checking quantities and costs; (6) Making a site survey, including investigating soil conditions, sources of water, sand and gravel, availability of electric power, telephone service, labor, rail connections, and road conditions, the extent of required excavation, and the facilities for housing labor; (7) Pricing the work to be done by and all of the costs of the petitioner on the job; (8) Assembling all the data, together with the bids of subcontractors into the bid; and (9) Personally filing the bid. During the taxable years, the chief executives of the petitioner, excluding Manson, worked with each other on the various steps in preparing bids. In some instances one or two would prepare a bid; *36 in others a group of three or four or five would participate. Accordingly, the six of the chief executives participated in getting petitioner's new business. During the years here involved, after contracts were awarded to the petitioner, one or more of the chief executives was assigned to the supervision of construction and performance under a contract. In general, George Farnsworth, Richard Farnsworth, H. Pratt Farnsworth, and Dunbar Chambers, each, had crews of assistants. foremen, and workers working under him; and they were assisted in administrative and other matters by Manson and Good. O. J. Farnsworth was the general manager. Although one or two of the chief executives were usually responsible for the performance of work under a contract and the profitability thereof, the combined work of the seven chief executives, or managers, was utilized. Good's services in locating and buying materials and contacting and checking sub-contractors, and in assisting in pricing contracts was highly important. Manson's work in administrative and fiscal matters was also highly important. And the controlling supervision of O. J. Farnsworth was very important in the success of all the work. The *37 extent of the earnings of the petitioner in the taxable years was very largely the result of the co-ordinated and combined work of the seven executives, and their joint efforts. However, each did not contribute equally, and the differences in the compensation paid to each were based upon the value of the services contributed which, in turn, depended upon experience, skill, and the size of the contracts to which an executive was assigned. During the taxable years, large projects were constructed. They afforded certain economies because of their size, but they also presented special problems; and in some instances the speed required and scarcities of materials and labor presented hazards and risks. Prior to 1942, during 1940 and 1941, the petitioner performed work on some very large projects in the construction of mass housing, slum clearance, and local institution buildings and public buildings. It was not until 1942 and 1943 that the work done by petitioner was chiefly under government contracts which were related to the war effort. From 1942 to about 1944, government regulations reduced greatly private construction. Most of the government contracts completed by the petitioner during *38 1943, 1944, and 1945 were lump sum contracts rather than cost plus fixed fee contracts, although some of the work completed in each of the taxable years was done under cost plus fixed fee contracts, and in terms of completed contract prices, 64 per cent of the government contracts completed in 1942 were cost plus fixed fee contracts. [1] However, the gross operating profit derived from such contracts in 1942 was only 22.22 per cent of total gross operating profits. On the whole, during the taxable years, the petitioner obtained government contracts only in active competition with other contractors, and the skill and efforts of the seven chief executives went into the obtaining of the contracts through effective bidding. The *39 following schedule shows the amounts and the numbers of bids prepared by the six executives who were engaged in the preparation of bids for new business during the taxable years and during 1941, the number of bids which obtained new contracts, and the number of bids which failed to obtain new contracts: Year
Number of
Number of
of
Contracts Bid -
Total Am't
Contracts Bid -
Total Contract
Bid
Not Awarded
Bid
Awarded
or Bid Price
1941
47
$24,185,531
13
$ 7,017,249
1942
48
40,724,254
23
16,351,758
1943
63
17,754,887
35
16,129,932
1944
183
56,416,017
78
5,456,227
(N.O. Div.
66
16,230,941
51
3,748,071)
(Hstn Div.
117
40,185,076
27
1,708,156)
1945
245
58,094,057
56
5,516,914
(N.O. Div.
78
15,893,364
32
3,521,265)
(Hstn Div.
167
42,200,693
24
1,995,649)
The above schedule shows that the total bids made during 1941, and during the taxable years 1942-1945 were: 1941, 60 bids; 1942, 71 bids; 1943, 98 bids; 1944, 261 bids; 1945, 301 bids. The bids made by the Houston office in 1944 and 1945 were for small or comparatively small contracts which accounts for the increase in the number of bids made in the group of bids made for contracts which were not awarded. The decrease of government contracts began in 1944, and by 1945 the volume of the petitioner's *40 business declined as a result of the tapering off of construction by the government. Most of the contracts in progress and uncompleted at the end of 1944 and 1945 were contracts awarded by private concerns or local government and were not federal government contracts connected with the war effort. The volume of construction work executed by the petitioner reached its peak in 1943. On the basis of completed contracts in each year, petitioner's gross receipts from completed contracts, as is shown by the following schedule, were $7,489,720.12, or 130.42 per cent, greater in 1942 than in 1941; and $2,877,284.83, or 21.74 per cent greater in 1943 than in 1942. Gross receipts from completed contracts were $6,685,959.51, or 41.50 per cent less in 1944 than in 1943; and $3,388,806.56, or 35.96 per cent less in 1945 than in 1944. Gross
Receipts
Increase
Gross
Increase
Completed
Completed
or
Operating
or
Year
Contracts
Contracts
Decrease *
Profit **
Decrease *
1941
11
$ 5,742,614
$ 448,779
1942
23
13,232,334
7,489,720 - 130.42%
946,029
497,250 - 110.80%
1943
22
16,109,619
2,877,284 - 21.74% 2,700,433
1,754,404 - 185.45%
1944
69
9,423,659
(6,685,959 - 41.50%)
1,349,941
(1,350,492 - 50.01%)
1945
67
6,034,853
(3,388,806 - 35.96%)
549,334
( 800,607 - 59.31%)
*41 Gross operating profit in 1942 was $497,250, or 110.80 per cent greater than in 1941; and in 1943, it was $1,754,404, or 185.45 per cent greater than in 1942. In 1944, gross operating profit was $1,350,492, or 50.01 per cent less than in 1943; and in 1945, it was $800,607, or 59.31 per cent less than in 1944. The above figures do not reflect the work in progress at the end of each calendar year and not completed until the following year. During 1941, the contracts completed yielded gross receipts of $5,742,614, but at the end of 1941 the petitioner had six uncompleted contracts which yielded gross receipts of $4,792,050.55 when they were completed in 1942. At the end of 1942 the petitioner had six uncompleted contracts which were completed in 1943 which yielded total gross receipts of $7,911,474. [2] *42 As the gross receipts from contracts completed in 1942 amounted to $13,232,334.66, the gross volume of business on hand during 1942, completed and uncompleted, aggregated $21,143,808.66. At the end of 1943 the petitioner had nineteen uncompleted contracts, eighteen of which were completed in 1944 and one of which was completed in 1945, which yielded total gross receipts of $7,234,623.56 in 1944 and $697,163.13 in 1945, [3] a total amount of $7,931,786.69. As the gross receipts from contracts completed in 1943 amounted to $16,109,619.49, the gross volume of business on hand during 1943, completed and uncompleted, aggregated $24,041,406.18. *43 At the end of 1944 the petitioner had in progress at its New Orleans office, 22 contracts which were completed in 1945, which yielded gross receipts of $2,279,078.71; and at its Houston office it had 8 uncompleted contracts which were completed in 1945, which yielded gross receipts of $988,112.48, or a total of 30 [4] uncompleted contracts which yielded $3,267,191.19. As the gross receipts from contracts completed in 1944 amounted to $9,423,659.98, the gross volume of business on hand, completed and uncompleted contracts, during 1944 aggregated $12,690,851.17. *44 At the end of 1945 the petitioner had on hand 17 uncompleted contracts [5] of which 15 were completed in 1946 and 2 were completed in 1947, which yielded gross receipts of $3,446,415; of which 10 contracts, $2,453,863, were in its New Orleans office, and 7 contracts, $992,452, were in its Houston office. As the gross receipts from contracts completed in 1945 were $6,034,853.42, the gross volume of business on hand during 1945, completed and uncompleted contracts, amounted to $9,481,268.42. *45 The following schedule sets forth the amounts received on uncompleted contracts by the petitioner as of December 31 of 1941 and of each year involved, under contracts in progress and uncompleted at the end of each year, and the total volume of business on hand at the end of each year, represented by both completed and uncompleted contracts on the basis of gross receipts when completed: Gross Receipts
Am'ts Rec'd, as
on Completion
of 12/31 on
From Contracts
Uncompleted
on Hand
Year
Contracts
Each Year
1941
$ 985,207
$10,534,650
1942
6,033,741
21,143,808
1943
2,959,702
24,041,406
1944
1,451,390
12,690,851
1945
1,344,296
9,481,262
The following schedules set forth the gross receipts (contract price) and gross operating profits realized on each contract completed by petitioner in each of the taxable years: 1942
Contract Price
Gross Profit
1. U.S. Staging Area (jt. vent. 1/2 gross)
$ 5,724,218.23 *
$ 106,868.51
2. Naval Air Base, New Orleans **
2,491,370.36 *
92,191.16
3. Algiers Naval Base
1,078,051.69
221,283.05
4. Moss St. Defense Housing **
1,148,970.84
197,169.23
5. Biloxi Defense Housing **
602,376.55
77,395.98
6. Jackson Barracks #2 **
376,436.65
32,089.15
7. Jackson Barracks #3
734,469.89
98,170.19
8. U.S. Army Air Base, New Orleans
381,445.91
30,564.85
9. Navy Warehouse, Algiers
146,188.00
20,440.34
10. Todd Johnson #1 **
151,922.09
6,443.71
11. Todd Johnson #2 **
6,872.65
872.69
12. Baptist Hospital #1
* 172,334.14
8,364.49
13. Baptist Hospital #2
* 11,036.21
1,127.54
14. Recreation Bldg., Chalmette
24,016.84
3,102.40
15. U.S.A. Harding Field
63,212.00
12,120.28
16. U.S. Marine Barracks, Bell Chase
62,249.99
18,730.15
17. U.S. Air Base, Job L 9
20,453.00
5,462.82
18. Civilian Mess Hall
16,406.64
3,371.43
19. U.S.. General Depot
12,658.00
7,379.33
20. Algiers Pump Station
2,400.00
1,245.86
21/23. Miscellaneous
* 5,619.38
1,636.25
$13,233,209.06
$ 946,029.41
Gross Profit
*** $ 946,029.41
*46 1943
Contract Price
Gross Profit
1. General Housing, Centerville **
$ 5,431,316.92
$1,933,292.52
2. Hutments & Facilities, N.O. Air Field **
222,110.22
41,685.01
3. Housing, WACS, Staging Area
99,524.50
(462.66)
4. Hospital Facilities, Staging Area
219,441.39
14,182.90
5. Hospital Facilities, Camp Shelby
1,934,354.03
225,527.58
6. Hospital Bldg., Tuscaloosa
3,159,253.19
189,907.84
7. Hospital Bldg., Gatesville, Texas
1,674,289.55
169,413.90
8. U.S.A. Bomber Air Base
20,453.00
5,307.09
9. Harding Field #2 **
16,961.51
1,297.50
10. Hospital Addition, Camp Polk **
$ 263,973.50
$ 16,549.66
11. Camp Pontchartrain
13,631.00
1,510.84
12. WAAC Housing, Lake Charles **
42,759.76
2,966.14
13. Salvage & Recreation Center
19,238.01
1,698.54
14. Mess Hall, Camp Pontchartrain
15,032.30
2,048.56
15. U.S. Navy #4501, Air Base
* 2,916,659.26
88,456.90
16. Railway Express Agency
10,881.52
3,184.33
17. Railway Express Agency, Dryades St.
80.00
27.10
18. Otis Astoria Co.
46,005.53
971.16
19. Tulane Gym
2,296.00
9.97
20. Touro Synagogue
* 239.22
13.00
21. St. Charles Ave. Baptist Church
* 762.16
85.12
22. Vories Baking Co.
* 356.92
49.29
$16,109,619.49
$2,697,722.29
Gross Profit
*** $2,697,722.29
*47 1944
Contract Price
Gross Profit
1. Napoleon Ave. Presb. Church
* $ 801.64
$ 99.12
2. Vories Baking Co.
* 226.84
25.88
3. Mrs. Merrill
* 35.30
12.80
4. Gentilly Baptist Church
* 227.50
65.67
5. Colonel Agnew's Res.
* 1,488.11
33.72
6. Air Reduction Sales
* 7,905.43
770.33
7. Mandeville Encampment
* 805.05
87.28
8. American Red Cross
852.00
679.11
9. Algiers Warehouse **
311,566.65
3,156.72
10. Algiers Guard House **
102,086.00
4,432.44
11. Algiers Barracks **
87,364.66
12,324.62
12. Algiers Guard House **
80,615.17
5,911.32
13. Officers' Mess Bldg. **
72,542.00
2,964.76
14. WAVE Barracks
64,793.39
2,876.88
15. Algiers Target Range
34,419.00
3,303.01
16. Torpedo Overhaul Shop
46,341.00
2,474.93
17. Baptist Penthouse
* 17,227.88
160.71
18. Depth Charge Test Bldg
158,453.00
53,199.10
19. Dillard
52,755.49
6,528.25
20. Dillard Job #2 & #3
4,049.92
1,376.73
21. Federal Vault
643.00
205.53
22. Gulfport Gun Docks **
25,846.31
4,265.63
23. Gulf Distilling Corp.
2,484.00
1,728.94
24. Gulf Distilling, extra jobs
7,093.00
2,305.18
25. Higgins Housing Job #1 **
215,490.08
63,856.25
26. Higgins Housing Job #3
468,867.20
77,233.10
27. Naval Ind. Mgrs. Garage
1,600.00
211.90
28. LeGarde Hospital Gym **
30,202.81
4,729.32
29. Higgins Aircraft, Michaud Job
68,781.98
(5,066.42)
30. Clearing
42,609.60
(1,501.66)
31. Navy Supply Depot
20,588.00
3,265.46
32. Navy Supply Depot
35,547.58
2,599.78
33. Navy Supply Depot
19,185.19
1,085.74
34. Natatorium, Navy Reserve **
132,503.82
4,740.44
35. B-1-B Barracks **
75,058.38
4,823.81
36. WAVE Barracks **
140,684.75
10,582.74
37. Assembly & Repair Shop (NOY 5994) **
96,088.98
36,489.61
38. Naval Hospital
* 352,619.00
35,571.05
39. Orange Housing **
3,525,782.12
756,940.73
40. Orange Additional Housing **
828,401.29
57,010.13
41. Orange Tank Job **
123,380.00
25,442.58
42. Orange Infirmary & Cafeteria **
69,661.61
36,776.46
43. Orange Store Bldg. **
12,666.28
5,340.96
44. Housing Facilities, Port Arthur, Texas**
150,548.65
28,374.67
45. Housing Facilities, Pascagoula, Miss.**
$1,154,134.00
$ 43,125.90
46. Ingalls Shipbuilding Corp.
4,153.38
1,037.16
47. Penny Arcade Demolishing
1,358.20
10.74
48. Tuscaloosa General Hospital
47,442.22
16,015.92
49. Transportation Equipment Co.
1,475.00
739.35
50. Y.M.H.A.
* 4,152.63
620.10
51. Navy Dept. Houston
20,534.00
2,083.60
52. Navy Dept. Corpus Christi
152,840.06
6,920.73
53. Tin Processing Corp.
53,577.15
(6,326.14)
54. Houston Schools - Texas
355,021.74
(10,545.97)
55. Weingarten's Store, Orange
775.12
(48.90)
56. Weingarten's Reroofing, Orange
18,684.00
6,007.85
57. First Baptist Church, Orange
* 6,525.66
722.25
58. Cafeteria Partitions, Orange
357.81
273.81
59. Drag-in Kitchen, Orange
* 2,768.46
668.46
60. St. Mary's School, Orange
3,300.00
1,906.19
61. Livingston Shipbuilding Co.
* 46,367.60
5,367.60
62. First National Bank, Orange
* 15,997.46
6,715.11
63. United Gas Corp., Orange
400.00
358.05
64. Bellows Const. Co., Orange
* 92.81
.22
65. Outfall Sewer Line, Orange
16,182.34
10,112.64
66. Stark's Store, Orange
* 7,917.95
566.40
67. Navy Dept., Fire Damage, Orange
2,445.06
866.08
68. West End Presbyterian Church, Houston
* 692.01
2.02
69. R. A. Farnsworth, Res.
* 15,564.66
$9,423,659.98
$1,344,694.48
Gross Profit
*** $1,344,694.48
*48 1945
Contract Price
Gross Profit
1. Algiers Laundry Bldgs. **
$ 210,860.00
$ 6,289.94
2. St. Catherine School **
20,111.86
2,008.64
3. Consolidated Vultee Co., A'gts., DPC **
114,795.34
9,445.74
4. New Orleans Levee Bd. **
49,321.62
3,003.70
5. Gulf Distilling Corp., Extra #3
5,553.52
776.31
6. Gulf Distilling Corp., Tank Fdns. **
33,654.84
5,905.46
7. Higgins Job #2 **
697,163.13
94,113.98
8. Recreation Bldg., Higgins **
38,266.13
3,711.21
9. Illinois Central Shed **
26,457.95
4,545.90
10. Dr. Robt. A. Katz, Office Bldg.
12,290.76
764.14
11. Mess Hall & WAVE Barracks **
288,138.00
38,048.40
12. U.S.A. Fire Protection Insulation **
29,031.00
7,306.56
13. U.S.A. Subsistence & Service Bldg. **
54,255.00
16,759.23
14. Air Reduction Sales Co.
6,256.60
1,144.43
15. St. Charles Ave. Baptist Church
* 3,785.71
149.24
16. Baptist Institute Boiler House **
* 60,327.02
3,329.42
17. Baptist Hospital Incinerator
* 11,376.21
1,024.48
18. Baptist Nurses Home **
* 191,644.25
13,598.33
19. Baptist Hospital Job #1
* 13,943.06
3,676.71
20. D. T. Odom (Consolidated Vultee)
1,563.42
560.24
21. Chalmette Paving **
15,592.16
(2,228.51)
22. Frieberg Mahogany Co.
13,066.88
2,300.53
23. U.S.A. Camp Shelby
213,116.27
39,860.64
24. U.S.A. Gulfport Air Field, Hangar
346,264.12
(16,356.02)
25. John Andrews Hospital **
285,193.43
16,137.24
26. U.S.A. Concrete Levee Slope **
67,768.59
(1,704.11)
27. National Distilling Corp.
18,250.50
5,066.42
28. Mrs. Voorhies Residence
* 228.53
80.11
29. International Lubrication Corp.
* 434.38
125.75
30. Baptist Bible Institute, Cabinets
* 3,709.22
526.56
31. City of Bogalusa, Colored School
* 82,959.70
2,475.72
32. Dillard University, Veterans' Bldg.
* $ 6,909.12
$ 870.25
33. Dillard, Students' Study
* 2,035.49
353.20
34. Dillard, Boys' Dormitory
* 2,066.67
475.80
35. Holy Name Hospital, Gadsden, Ala. **
183,515.24
17,216.01
36. Holy Name Hospital, Ambulance Drive, etc.
4,158.19
3,372.70
37. Reynolds Alloy Co., Sheffield, Ala.**
132,185.52
19,349.36
38. City of New Orleans, Moisant Airport **
293,801.49
8,387.89
39. E. P. Ludwig, Moisant Airport
11,709.00
(2,657.29)
40. Nurses Home, Tuskegee Nurses School
307,482.22
1,603.44
41. St. Anna's Asylum
* 142.61
15.10
42. Pascagoula Junior High School **
184,159.27
2,924.99
43. Houston School District, Dump Pit
2,235.72
519.01
44. Humble Oil Co., Baytown Road
18,519.54
2,124.43
45. P.M.G. School, Camp Bullis, Texas
50,777.17
12,460.48
46. Nat'l Housing, Emergency Levee, Orange
* 3,004.42
1,097.06
47. City of Houston, Kress St. Water Main **
18,662.21
(489.07)
48. City of Houston, Sewer (60inch)
246,000.44
60,736.61
49. City of Houston, Water Line (6inch X 8inch)
54,580.14
(3,486.80)
50. Nat'l Housing, Hutments, Orange **
89,423.50
25,135.77
51. City of Houston, Hangar #8
34,209.12
4,764.20
52. City of Houston, Kirby St., Water Line **
104,028.37
6,873.86
53. City of Houston, Water Mains (2inch)
3,185.05
993.14
54. City of Houston, Lynn Terrace Sewer
64,971.67
15,044.68
55. Dow Chemical Co., Lake Jackson Store
83,990.90
(5,943.97)
56. U.S.N. Additions to Hospital, Corpus Christi
59,034.51
9,241.36
57. U.S.N. Hospital Fdns. Houston **
141,132.74
(3,399.51)
58. Federal Works Agency, School, Orange
106,214.54
13,143.60
59. Nat'l Housing, Paving, Drainage, Orange
12,561.92
3,707.72
60. Nat'l Housing, Road Repairs, Orange **
123,898.23
36,327.50
61. Housing Authority, Sewer Repairs, Orange
3,532.74
1,494.62
62. City of Orange, Paving, 17th & 18th Sts.
14,700.50
5,527.62
63. U.S.A. San Jacinto Ordnance Depot
11,107.00
2,202.86
64. Sweeney Industrial School District **
111,785.03
4,750.03
65. State of Texas, Highway #59 **
204,430.40
7,797.52
66. State of Texas, Highway #290 **
194,752.00
6,075.03
67. City of Houston, Gulf Crest Sewer Job
234,571.54
14,593.62
$6,034,853.42
$ 535,679.21
Gross Profit
*** $ 535,679.21
*49 The following schedule shows comparison of the gross receipts and gross operating profit from contracts completed in each of the taxable years with the same from contracts completed in 1941: INCREASE OVER 1941 COMPLETED CONTRACTS
1942 over 1941
1943 over 1941
Amount of Increase of Gross Receipts
$7,489,720 - 130%
$10,367,004 - 180%
Amount of Increase of Gross Operating Profits
487,249 - 110%
2,251,653 - 501%
1944 over 1941
1945 over 1941
Amount of Increase of Gross Receipts
$3,681,045 - 64%
$ 292,239 - 5%
Amount of Increase of Gross Operating Profits
901,161 - 200%
100,554 - 22%
The services rendered by each of the seven chief executives of the petitioner during 1942, 1943, 1944, and 1945 were in general as follows: O. Farnsworth: In each of the taxable years, O. Farnsworth performed the services and duties of the chief executive and manager of the petitioner, and his functions were chiefly executive in nature. His duties and responsibilities in 1942 and 1943 exceeded his duties and responsibilities in 1941, *50 and in the latter years his hours of work were greater. During 1944 and 1945 his duties and responsibilities were less than they had been in 1942 and 1943. This was due to the decreases in the construction work and receipts of new contracts in 1943 and 1944 as compared with 1942 and 1943. During the years involved in this proceeding - 1942-1945 inclusive - a large part of the services and responsibilities of O. Farnsworth were in the preparations of bids for contracts made by the New Orleans division of the petitioner in all of the phases of that part of petitioner's business. He participated in making the site survey, in the pricing, and in the assembling of the bids for substantially all of the bids which were made by the petitioner, both where bids were made unsuccessfully and successfully. In a comparatively few instances, where the jobs bid were relatively small, he did the entire work of preparing bids, through all of the steps heretofore described. He did not participate in the making of bids by the Houston division of the business, and he participated less in the contact work than did his associates George Farnsworth, Dunbar Chambers, Richard Farnsworth, and Louis Good. He *51 worked out pricing for the purposes of making bids with Good and with either George or Richard Farnsworth and Chambers, or with all of them, and the work of pricing for all bids made was work in which O. Farnsworth participated to a large degree. Among the larger contracts which were awarded to the petitioner during the period 1942-1945, the following were contracts in the bidding for which O. Farnsworth participated: Camp Plausche Staging Area, hospital and cantonment areas, $5,724,218; (1942); Camp Van Doren, general housing, $5,431,317 (1942); Camp Shelby, hospital buildings, $1,933,292 (1942); New Orleans Airport hutments, $222,110, (1942); Hospital buildings, Gatesville, Texas, $1,674,289 (1943); Hospital, Tuscaloosa, $3,159,253 (1943); Housing, Orange, Texas, $3,525,782 (1943); New Orleans Naval Hospital, $352,619 (1944); Laundry building, Naval Station, Algiers, La., $210,860 (1944); Women's dormitory and other buildings, Dillard University, New Orleans, $114,000 (1945). The following schedule, from exhibits 23 and 32, shows the total values of the contracts bid for which O. Farnsworth participated with others in pricing and assembling the bids. For convenience and further detail *52 showing his participation in site survey and contract work, exhibits 23 and 32 are incorporated herein by this reference. Pricing
Year
Contracts Awarded
Not Awarded
Total
1942
$ 21,149,557
$ 33,149,896
$ 54,299,454
1943
11,424,302
14,749,582
26,173,885
1944
2,723,906
34,551,339
37,275,246
1945
1,115,047
10,112,621
11,227,668
Assembling Bids
1942
$ 17,214,095
$ 11,331,736
$ 28,545,831
1943
9,908,670
7,259,376
17,168,047
1944
2,024,886
10,562,354
12,587,240
1945
2,560,988
5,439,668
8,000,657
Compared with the records of George Farnsworth and Louis Good, O. Farnsworth's participation in pricing was less than the participation of both of them in 1945, and was less than that of George in 1944. O. J. Farnsworth had the duty and responsibility of providing petitioner with the necessary capital through obtaining bank loans and bank credit, and he personally endorsed surety bonds of the petitioner. He made estimates, for the purpose of making bids, of the profit which the petitioner should realize from contracts. When the Houston division was opened in 1944, he directed and advised on the organization and work of that office. George Farnsworth: During the years 1942 and 1943 the duties and responsibilities of George Farnsworth *53 were greater than in 1941. The large increase in the number and size of construction contracts awarded to petitioner in 1941, which were completed in 1942, and which were awarded in 1942 and 1943 required longer hours, multiplicity of detailed work, and the concentration of greater efforts in the time allowed for the completion of construction. His duties comprised administrative work as a vice-president, participation to a substantial degree in the making of contacts, site surveys, pricing, and assembling of bids for both successful and unsuccessful bidding, and the personal supervision of some of the large construction work. During 1944 and 1945 his duties and responsibilities decreased below the levels reached in the preceding two years due to the decrease in the volume of petitioner's business, the decrease in the size of projects, and the lessening of the pressures of time within which to bid on and complete construction work related to the war efforts of the government. During 1944 and 1945 he did less work as an active superintendent of individual construction projects. As is shown hereinafter, the number of younger general superintendents, other than the older, chief executives *54 of the petitioner who served as job superintendents of work of the New Orleans and Houston offices, increased from two in 1942 and 1943 to nine in 1944, and to 14 in 1945. During 1944 and 1945 George Farnsworth and his brother H. Pratt Farnsworth were the general supervisors of the construction work handled by the New Orleans division with younger superintendents working under them. The departure of Richard Farnsworth and Dunbar Chambers from the New Orleans division in the spring of 1944, when they took charge of the newly organized Houston division, increased George Farnsworth's office and administrative work so that he could not personally superintend as much construction work as he had done previously. Construction jobs were smaller in 1944 and 1945. In the branh of the work concerned with the preparation of bids, George Farnsworth's duties were largely concerned with the contracts, site surveys, and pricing. He participated in the work of pricing and assembling bids with O., Richard, and H. Pratt Farnsworth, Louis Good, and Dunbar Chambers until Richard and Chambers went to the Houston office in 1944. His work in preparing bids for contracts awarded decreased substantially in *55 1944 and 1945, but increased in 1944 and 1945 on preparing unsuccessful bids. Exhibit 33 is incorporated herein by this reference to show in detail the total amounts of contracts - awarded and not awarded - in the preparation of bids for and in which George Farnsworth participated. The schedule in the margin [6] shows his participation in contact work, site surveys, and pricing in the years 1943-1945. George Farnsworth participated in preparing bids for the larger contracts awarded to the petitioner at Camp Plausche, Jackson Barracks, Camp Van Doren, Camp Shelby, New Orleans Airport, (1942); Tuscaloosa Hospital, Naval Air Station, New Orleans, Orange, Texas, war housing, U.S. Navy Contract 4501, Algiers Naval Station, and Pascagoula war housing (1943); and in almost all of the contracts awarded in 1944 and 1945 to the New Orleans division of petitioner's business. *56 The larger projects over which George Farnsworth had personal supervision in 1942 were the Naval Reserve Air Base at New Orleans, a cost plus fixed fee contract; gross receipts $2,491,370, and gross profit $92,191; and Jackson Barracks, a lump sum job, gross receipts $734,469, and gross profit $98,170. His work at the Naval Reserve Air Base was done at a saving to the government and at less cost than a job at Algiers, La., handled by another contractor, with the result that the government cancelled a contract at Algiers which it had awarded to another concern, received new bids, and awarded the contract under the re-bidding to the petitioner. During 1943 George Farnsworth personally supervised construction of the General Hospital at Tuscaloosa, Alabama, a lump sum contract, gross receipts $3,159,253, gross profit $189,907; and he supervised the construction of the U.S. Navy Barracks in New Orleans, a cost plus fixed fee contract, gross receipts $2,916,659, gross profit $88,456. During 1942 and 1943 George Farnsworth's services to the petitioner included, also, his giving his personal endorsement on the surety bond of the petitioner for the large housing project at Camp Van Doren, *57 Centerville, Mississippi ($5,431,317.) His work involved increased risks in getting materials and labor, and in pricing for bids. The amount of travelling he did increased. His decisions had to be made with speed. He and his associates handled the greatly increased volume of work in 1942 and 1943 without bringing into the organization additional executives to assist them. George Farnsworth, during 1942 and 1943 handled the problems connected with shortages of labor, and at Tuscaloosa, Alabama, his problems were especially difficult because of a labor jurisdictional problem, which he dealt with successfully. At Tuscaloosa he had, also, special problems in handling very large quantities of materials, in obtaining trucks for transporting them to the site, and in obtaining concrete mix trucks to pour concrete. During 1942 and 1943 the petitioner was awarded contracts which were the largest it ever had received, under which construction exceeded in size the largest jobs it had had in 1940 and 1941. George Farnsworth's services to the petitioner in 1942 and 1943 were of prime importance in petitioner's successful and profitable completion of its very large construction jobs. Richard Farnsworth: *58 In May of 1944, Richard Farnsworth was made manager of a new office of the petitioner in Houston, Texas. He then established his residence in Houston and became wholly engaged in developing the business for the Houston division. His work after May, 1944, followed a different although in many respects similar pattern to his work in the New Orleans division during 1942, 1943, and the first part of 1944. During 1942, 1943, and the early part of 1944, Richard Farnsworth's chief responsibility in the New Orleans organization was that of a general supervisor of construction-at-large, concerned with watching, checking, analyzing, and improving the efficiency of all operations at all of the projects. He specialized in cost analysis and the efficient use of machinery. He travelled from project to project, conferring with job superintendents, and he consulted with his six associates on problems and methods of solution. He searched for needed machinery which was scarce. He looked after the maintenance and repairing of machinery and attended to its installation in locations where it could be used the most economically and effectively. He gave attention to the efficiency of labor in the various *59 classes of work done. He worked on the corrections of mistakes which were made. He was also concerned with getting competent workers. His responsibilities, duty, and the scope of his work increased in 1942 and 1943 beyond his responsibilities in 1941, in proportion to the increase in the volume of petitioner's business in 1942 and 1943. During the first six months of 1942, Richard Farnsworth was the managing director of the construction work at the Staging Area in New Orleans, later called Camp Plausche, awarded on a cost plus fixed fee basis. The project was located in swamp lands and presented many very difficult problems. The work had to be completed within about six months. It involved the building of a cantonment area and of a hospital area. Petitioner's fee for the job was $106,868. The entire cost of the project was slightly over 11 million dollars, and about 9,000 workers were engaged there. Richard was assisted by Dunbar Chambers who was the project manager. Although the overall project was constructed under a joint contract by the petitioner and another joint venturer, Stevens Bros. and Miller-Hitchinson, who received a fee of the same amount as was received by the petitioner, *60 their services were concerned with the paving work and financial contributions. The construction work was done by the petitioner. The location and condition of the area required difficult preparatory work, including the elimination and drainage of water out of the swampy location. Labor was difficult to obtain. The government provided petitioner with engineering assistance. Through the ability and energy of Richard Farnsworth, Chambers, and their associates, the project was completed within the prescribed time and for $1,000,000 less than the government had estimated. In addition to the work described above, Richard Farnsworth participated in the various phases of bid preparations in both the New Orleans and Houston divisions. After he transferred to the Houston division this work was limited to the bids prepared by the Houston division which were prepared by Richard and Dunbar Chambers. He participated with his brothers and Chambers in preparing bids while he was in the New Orleans division. Exhibit 34 is, for convenience, incorporated herein by this reference for the detailed summary of the extent of his bid preparation work during the period 1942-1945. It sets forth details in the *61 same form as the material which appears in footnote 6. During 1942 and 1943 his work in the making of contacts, site surveys, in pricing, and in assembling bids was greater than in 1944 and 1945, in connection with awarded contracts. In 1944 and 1945 his work on bids not awarded was nearly as great or greater than in 1942 and 1943 which was due in part, at least, to his efforts to obtain business for the Houston division. For example, he participated in pricing of awarded contracts aggregating $21,654,287 in 1942; $12,842,896 in 1943; $1,671,067 in 1944; and $1,572,627 in 1945. And he participated in the pricing of contracts not awarded, totaling $40,655,000 in 1942; $16,280,000 in 1943; $34,408,000 in 1944; and $33,610,000 in 1945. From May, 1944, throughout the remainder of that year, and during 1945, Richard Farnsworth devoted a great deal of time to establishing the petitioner's business in the Texas area. The gross receipts for 1944 of the Houston division, and the gross profits amounted to, respectively, $720,043 and $25,650; and in 1945 they were, respectively, $1,991,309 and $221,321. Richard Farnsworth was one of those who advocated the increase in the salaries of the seven *62 chief executives of the petitioner in 1942 and 1943. He recommended the salary increases because he considered that the seven executives had increased their services in 1942, 1943, and 1944 and were rendering services of values which were equal to the amounts agreed upon as the salaries to be paid. He based his opinion, also, upon his knowledge of the salaries being paid by others to executives in the building construction industry. Dunbar Chambers agreed with Richard Farnsworth's recommendations of salary increases. Dunbar Chambers: During 1942, 1943, and the first part of 1944, Dunbar Chambers was part of the New Orleans division of petitioner's business, and his chief duties were the supervision of construction of projects. He participated with five of the key executives in the New Orleans division in all of the steps taken in preparing bids. He has marked ability and his services were of great value to the petitioner. His responsibilities and duties increased in 1942 and 1943 beyond his responsibilities in 1941, and were of greater value to the petitioner. During the first six months of 1942, he was the project manager of the Staging Area job at Camp Plausche, assisting Richard *63 Farnsworth, where he contributed very substantially to the execution of the work and the solution of problems above described. Upon completion of the large Staging Area project, he supervised, in 1942, construction of Jackson Barracks, No. 2., a lump sum contract of $376,436. He started in 1942, the general housing contract at Camp Van Doren, Centerville, Mississippi, a lump sum contract of $5,431,316, upon which the petitioner realized a profit of $1,933,292. He supervised the job throughout, up to its completion in the spring of 1943. During 1943 he also supervised the construction of the hospital building at Gatesville, Texas, a lump sum contract of $1,674,289, from which petitioner realized a gross profit of $169,413. After that job was completed he supervised construction of a war housing project at Orange, Texas, which was completed early in 1944, a lump sum contract of over $3,500,000, on which gross profits exceeded $750,000. In May, 1944, Chambers moved to Houston to join with Richard Farnsworth in managing the Houston division. There he and Richard handled all of the work in preparing bids made by the Houston division. The volume of business of the Houston division in 1944 *64 and 1945 reflected the general decline in the volume of building construction generally from the peak reached in 1943. Chambers devoted all of his time to the work of the Houston division in 1944 and 1945, but his responsibilities and the volume of work he handled was, in these years, less than it had been in 1942 and 1943. During 1942, 1943, and 1944, Chambers participated in the preparation of bids in the New Orleans office, and he did the same in the Houston office in 1944 and 1945. Exhibit 36 is incorporated herein by this reference to give the detailed summary of the volume of bids on contracts awarded and not awarded in the bid work in which he participated with his associates. Cf. footnote 6. He worked on all phases of the bid preparation work, making contracts, site surveys, pricing, and assembling of the bid. In the Houston division he also contacted sub-contractors and material men with Richard Farnsworth. His participation in the bid preparation work, measured by the size of the dollar amounts of contracts awarded was the greatest in 1942, when he worked on bids for contracts awarded in the aggregate amount of roughly $17,000,000. In 1943, 1944, and 1945 the bid work in *65 which he participated for contracts awarded aggregated, roughly, $6,000,000 and in excess of $1,000,000 respectively. H. Pratt Farnsworth: H. Farnsworth was a supervisor of construction in the New Orleans division during 1942, 1943, 1944, and 1945. He supervised larger construction jobs during these years than he had done in 1941, and his duties and responsibilities were greater in 1942 and 1943 than they had been during 1941. After Richard Farnsworth and Chambers transferred to the Houston division in 1944 he was placed in charge of larger projects. In 1942 he supervised the construction of the Algiers Naval Station and warehouses and of the Todd-Johnson Shipyards, a total of $1,383,034.43 work. In 1943 he constructed the hospital at Camp Shelby, the hospital facilities and the WAAC housing at the Staging Area, and the Otis-Astoria job, or a total of $2,299,325.45 work. In 1944 he built the warehouses, guardhouse and barracks at the Algiers Naval Station, the housing facilities at Pascagoula, Mississippi, and the warehouses for Consolidated Vultee, or a total of $1,773,061.25 work. In 1945 he went to Lexington, Kentucky to build a $1,500,000 hospital, which was completed in 1947. *66 He participated, also, in the preparation of bids, with his associates. Exhibit 37, giving a summary of the work in which he participated, is incorporated herein by this reference. Cf. footnote 6. His participation in work connected with making bids was, in 1942, 1943, and 1944, substantially less than the participation of each of his six associates. His responsibilities were less in 1945 than they had been in 1942, 1943, and 1944. Louis K. Good: Louis K. Good performed exceedingly valuable services to the petitioner during all of the years here involved. His services included important administrative work which none of his seven [six] associates performed and without which the work of the petitioner could not have been as successfully executed. His duties and responsibilities in 1942 and 1943 were substantially greater than in 1941. With the tapering off of the volume of the petitioner's business in 1943 and 1944, his responsibilities and the detail and scope of his work correspondingly decreased. During all of the years involved, he participated in a substantial way in the pricing work and other phases of preparations of bids, the details of which are set forth in exhibit 35, which *67 is incorporated herein by this reference. Cf. footnote 6. However, his work in the preparation of bids was reduced in 1944 and 1945 as compared with the two preceding years. Good's chief and most difficult responsibility during 1942, 1943, 1944, and 1945 was the purchasing of materials which were scarce and hard to locate. Although the petitioner received priorities for materials, the priorities were not of the highest, and Good's task involved overcoming many obstacles which attended the procurement of materials covered by the priorities, especially in 1942 and 1943. In 1944 and 1945 materials continued to be scarce. Good also was in charge of contacting sub-contractors and of coordinating among the various jobs the distribution of materials. In 1944 and 1945 he advised the Houston office on its sub-contracting and purchasing of materials. His work required attention to detail and the exercise of skill and ingenuity. S. K. Manson: During 1942 and 1943 the details of Manson's duties, heretofore described, were greatly multiplied and exceeded his responsibilities during 1941. He made up the payrolls for the largest construction projects during 1942-1945, which were very high. He checked *68 all purchases of materials which became a voluminous task in 1942 and 1943. In 1944 he installed the bookkeeping system in the Houston office and kept the accounts for petitioner's two offices in 1944 and 1945. In this respect, his responsibilities in 1944 and 1945 were enlarged, but on the whole they were less detailed, extensive and arduous in 1944 and 1945 than in 1942 and 1943 because of the general decrease in the latter two years in the volume of petitioner's business. During 1942 and 1943 the petitioner employed two general superintendents of construction work, V. Martinez and Philip Farnsworth, who, in addition to the work done by certain members of the group of seven chief executives, supervised the work done under contracts. During 1944, in addition to Martinez and Philip Farnsworth, the petitioner employed seven other, or nine general superintendents; and during 1945, employed fourteen general superintendents, five of whom were newly employed as general superintendents. The following schedule shows the salaries paid to "other general superintendents", the number of projects supervised, the office to which each was assigned, and the gross receipts and gross profit derived *69 from the projects which each superintended No. of
Gross
Gross
General Superintendent
Salary
Jobs
Receipts
Profit
1942
V. Martinez, N. O.
$11,013
4
$ 401,510
$ 59,652
Philip Farnsworth, N. O.
6,119
2
682,884
69,263
$17,132
$1,084,394
$128,915
1943
V. Martinez, N. O.
$ 8,279
4
$ 341,003
$ 23,263
Philip Farnsworth, N. O.
6,533
1
222,110
41,685
$14,812
$ 563,113
$ 64,947
1944
V. Martinez, N. O.
$ 5,252
1
$ 1,488
$ 33
Philip Farnsworth, N. O.
8,318
1
215,490
63,856
B. Garvey, N. O. and Hstn
9,574
5
282,882
16,515
H. Lott, Hstn. and N. O.
8,166
7
437,898
5,400
D. Snow, Hstn.
6,210
1
53,577
6,326
H. Shepard, N. O.
6,166
4
636,897
134,466
P. Vortisch, N. O.
6,102
1
68,781
5,066
J. Robert, N. O.
5,405
2
80,760
5,777
L. Branch, Hstn.
5,380
1
52,876
16,986
$60,573
$1,830,652
$231,643
1945
P. Farnsworth, N. O.
$ 7,020
4
$1,369,831
$119,517
B. Garvey, Hstn.
10,100
2
83,286
24,065
H. Lott, Hstn.
6,500
2
299,543
29,638
D. Snow, Hstn.
5,980
2
280,209
65,500
H. Shepard, N. O.
4,590
9
672,513
55,707
P. Vortisch, N. O.
5,980
2
187,673
20,588
J. Robert, N. O.
4,600
4
608,675
19,031
L. Branch, Hstn.
5,720
4
403,072
47,173
G. McCoy, Hstn
5,650
3
250,944
18,302
C. Ruckstuhl, N. O.
5,720
2
139,105
20,699
L. Payronin, Hstn.
5,300
1
111,785
4,750
J. Leith, Hstn.
5,200
1
83,990
5,943
E. Strickler, Hstn.
5,100
6
367,964
55,256
V. Martinez, N. O.
(not given)
1
184,159
2,925
Total
$5,042,754.90
$477,214
*70 The following schedule shows the petitioner's earned surplus at the end of the years 1941 to 1945 inclusive: Earned Surplus
Year
End of Year
1941
$173,865.69
1942
253,757.29
1943
736,731.20
1944
797,770.62
1945
714,509.90
The total compensation of $246,000 paid to the seven executives in 1942 represented 26 per cent of that year's gross operating income. The total compensation of $259,040 in 1943 and of $258,868 in 1944 represented 9.1 per cent and 19.2 per cent of the respective years' gross operating income. The total compensation of $194,499.84 in 1945 represented 35.4 per cent of the year's gross operating income. From 1935 through 1949 the petitioner declared dividends on its common stock and paid the dividends as follows: Paid
Cash Per
Form of
Year
Dividends
Share
Payment
1935
None
1936
$ 23,000
stock
1937
69,000
notes
1938
25,000
notes
1939
35,000
notes
1940
* 87,636.73
cash - stock *
1941
None
1942
77,920
$41.60
cash
1943
$ 93,650 $50
cash
1944
93,650
50
cash
1945
None
0
1946
40,000
20
cash **
1947
101,725
25
cash
1948
122,070
30
cash
1949
106,610
35
cash
No dividend was declared in 1941 because of the need for working capital to carry out the increased construction program resulting from *71 the war. In 1945 a net loss was sustained and, therefore, no dividend was declared. On July 6, 1942, the petitioner's board of directors by resolution fixed the amount of compensation for the seven executives for 1942. The compensation for 1943 was fixed on December 15, 1942, by a resolution of the board. The petitioner continued to pay the same compensation in 1944 as was paid in 1943 to its executives, although the board did not pass a resolution to that effect in 1943 or 1942. On April 29, 1945, the board by resolution fixed the compensation for that year at lower amounts than in the previous years. The executives' compensation was fixed on the basis of a straight salary. The board did not at any time consider the possibility of dividend payments in connection with the determination of the executives' compensation. It was not until the end of any year that it was determined whether dividends would be paid. The reasonable annual compensation for each of the seven chief executives of the petitioner for services actually rendered to the petitioner during each of the taxable years are as follows: 1942
1943
1944
1945
O. Farnsworth
$45,000
$49,007
$33,500
$31,000
G. Farnsworth
42,000
43,468
32,000
29,000
R. Farnsworth
42,000
43,737
32,000
29,000
S. Manson
30,000
31,705
23,500
21,000
L. Good
33,000
34,321
24,000
24,000
D. Chambers
36,000
37,333
24,000
22,000
H. Farnsworth
18,000
19,468
16,000
14,000
Opinion *72 The question to be decided arises under sections 23(a)(1)(A) and 23(p)(1)(D) of the Code. The petitioner contends that the amount of salary which it paid to each executive for services rendered in 1942, 1943, 1944, and 1945 is reasonable and, therefore, deduction under section 23(a)(1)(A); and that for 1943 and 1944 the annual salary paid to each executive, plus the amount contributed by the petitioner to the pension trust fund for each executive, consitutes reasonable compensation for services rendered by each one during 1943 and 1944, and therefore the amounts paid in each year to the pension trust fund also are deductible under subsections (a)(1)(A) and (p)(1)(D) of section 23. We believe it is clear that pension fund payments made in years to which the amendments to section 23(p) apply, must meet the tests of section 23(a)(1)(A) in order to be deductible under subsection (p)(1)(D) because the underlying reason for allowing a deduction is that the pension fund payments by the employer are in the nature of additional compensation for services rendered by the employees covered by the pension plan. Cf. . The petitioner does not contend that the *73 amounts paid for annuity contracts premiums, as contributions for the executives to the pension fund were not in the nature of additional compensation for services rendered by them during 1943 and 1944. Accordingly, deductibility of the pension fund payments depends upon our determinations of the amounts of total compensation for each executive for 1943 and 1944 which are reasonable. The pension fund payments are deductible only if the total amounts of the salaries plus the pension payments are a reasonable allowance for compensation. See Regulations 111, section 29.23(p)-1, which provides that in order for a taxpayer to be allowed to deduct under section 23(p)(1)(D) the amounts it has paid into a pension trust fund for the benefit of employees, it is necessary that "the entire contributions for the taxable year when added to other compensation paid must represent reasonable compensation for services rendered by the employee beneficiaries." This Court has determined the amounts of reasonable allowances for compensation for each of the seven executives of the petitioner for the year 1941 in an unpublished Memorandum Findings of Fact and Opinion entered on March 5, 1947, in Docket No. *74 8826. It was found that the amounts of the salaries paid to each executive in 1941 were reasonable. Each party to this proceeding has made arguments with respect to 1942, 1943, 1944, and 1945 which involve comparisons of the total compensation paid to each of the executives in the years here involved with the amounts of compensation which were found by this Court to be reasonable for 1941. Many of the exhibits of the petitioner have been prepared on the basis of comparisons of each of the years involved with 1941. The respondent has argued that a reasonable allowance for compensation of each executive for 1942, 1943, and 1944 should be closer to the amounts which were held to be reasonable for 1941 than to the amounts which were paid in 1942, 1943, and 1944. His determinations of salary deductions for those three years are slightly in excess of the amounts which were paid and judicially allowed for 1941, from which it may be deduced that he concedes that the executives rendered some increased services in 1942, 1943, and 1944. Since each party relies strongly upon comparisons with 1941 salaries, it should be said at the outset that each taxable year stands upon the facts existing in *75 each year, and, even though neither party goes as far as to urge res judicata, that the determinations which were made for 1941 in the prior proceeding, Docket No. 8826, are not res judicata of the questions presented in this proceeding. . As we had occasion to point out in , the findings made on the question of the reasonable allowances for 1941 salaries in the earlier case does not make res judicata the question of reasonableness of salaries for 1942, 1943, or 1944. The respondent contends that increases in gross receipts and profits in the years involved were due to fortuitous circumstances created by the war economy rather than to the efforts of petitioner's seven chief executives, and that the salaries paid were in part a distribution of stock dividends rather than compensation for services. The evidence relating to 1942 and 1943 does not support the theories of the respondent. Although the government's contracts for large construction of war housing, cantonments, hospitals, and the various facilities built in connection with war mobilization provided petitioner with greatly increased income and profits, *76 it cannot be concluded that the petitioner executed its contracts in 1942 and 1943 without the expenditures of substantially increased efforts of its executives. Petitioner's performance under all of its contracts was primarily dependent upon the work, skill, and judgment of the seven men whose compensation is in dispute. They worked out the bids, in competition with others, for all contracts except the negotiated, cost plus fixed fee jobs which were in the minority, and they organized and supervised all of the construction work. The evidence shows that in 1942 and 1943 the executives undertook many risks and that the construction work entailed hazards; that the jobs were complex and were not simple nor free from many problems; and that among the problems were the procurement of material and machinery which were difficult to obtain even with the types of priorities provided. To the extent that comparisons with 1941 are validly to be made, the comparisons support the petitioner's contentions rather than those of the respondent with respect to 1942 and 1943. Contrary to the respondent's argument, the responsibilities and efforts of each of the seven executives were greater in 1942 than *77 in 1941, and they were still greater in 1943 than in 1942. The volume of work handled in 1942, measured in terms of receipts from completed contracts was 130.42 per cent greater in 1942 than in 1941, and gross operating profits were 110.80 per cent greater. The volume of work performed in 1943 was 21.74 per cent greater than in 1942, and gross operating profits were 185.45 per cent greater. The copious and detailed evidence of the petitioner clearly demonstrates that the petitioner's chief executives expended efforts in 1942 and 1943 which exceeded their efforts in 1941, and that their increased efforts corresponded in some degree with the increased volume of construction. With respect to the years 1942 and 1943, and comparing each year with 1941, it cannot be concluded that the business of the petitioner in the three years was the type of mass production where output and profits progressively increase without increases in the services of the seven executives. The question with respect to the years 1944 and 1945 has different aspects. The government's needs for extensive construction declined after 1943, and petitioner's gross receipts in 1944 from completed contracts decreased $6,785,959, *78 or 41.50 per cent below gross receipts for 1943. Gross operating profits were $1,350,491 less in 1944 than in 1943, which represented a decrease of 50 per cent. In 1945 there were further decreases in the volume of petitioner's business. Gross receipts in 1945 were $3,388,807 lower than in 1944, or 35.9 per cent less, and gross operating profits were $800,607, or 59 per cent less. In spite of the very substantial decreases in petitioner's volume of business and gross profits in 1944, the petitioner in 1944 paid to each of its seven executives the same amounts of salaries as it had paid in 1942 and 1943, and in addition paid about the same amounts into the pension trust fund as it had paid in 1943, so that the total compensation to each in 1944 was practically the same as in 1943. The petitioner, recognizing the decrease in its business in 1945, reduced the amounts of the salaries of all of the executives for 1945. It is necessary to point out, however, that the determinations which have been made by the respondent for 1945 reduce the allowances for 1945 salaries below the amounts which the petitioner paid. We have in this proceeding agreement by the parties that the allowances for *79 compensation in 1942 and 1943 should be greater than for 1941, and that they should be lower in 1945 than in 1944, but there the agreement ends, and the parties differ as to what amounts of compensation are reasonable in each of the four years involved. The questions presented for each of the years 1942-1945 are what amounts constitute reasonable allowances for the compensation of each of seven executives for the services each actually rendered in each year. These questions are questions of fact. ; affd., , (CA-2); certiorari denied ; (CA-2); certiorari denied, ; and Burford-Toothaker Tractor Company v. Commissioner, - Fed. (2d) -, (CA-5) decided Nov. 16, 1951. Having before us voluminous and detailed evidence and the opinions of witnesses who are executives in the same or comparable businesses as the petitioner's as to what represents reasonable compensation for executives performing the same functions as the petitioner's executives, we have found, upon thorough analysis of all of the evidence, what in our best judgment is a reasonable *80 allowance in each of the years 1942, 1943, 1944, and 1945 for each executive for the services actually performed. Consideration has been given to the opinions of the witnesses of reasonable salary allowances, and to the fact that no witnesses were called by the respondent to express opinions as to reasonable compensation. We find that the salaries paid in 1942 to each executive were reasonable compensation and that the salaries plus the pension fund contribution in 1943 represented reasonable compensation to each of the executives. Although there is no evidence of any established standard for fixing the compensation of executives in the construction industry, or formula, such as a customary percentage of gross receipts or gross profits, cf., , (CA-2), the ratios of the compensation to gross income have been taken into account, - 1.86 per cent in 1942 and 1.53 per cent in 1943. The increase in earned surplus and the distributions of cash dividends, $77,920 in 1942, and $93,650 in 1943, and other factors have been considered. It is clear beyond question that the petitioner's large amount of construction work in 1942 and *81 1943 was executed successfully by virtue of the services, skill, and direction of its seven executives who were called upon to greatly increase their efforts and apply their judgment and experience both of which were of a high order. The testimony of witnesses having knowledge of the salaries paid in 1942 and 1943 to executives in comparable construction business is that the salaries paid by the petitioner to its executives in 1942 and 1943 were in line with what was then currently paid in the industry for like services. We are unable to find, however, from all of the evidence that reasonable allowances for salaries in 1944 are equal in amount to the amounts which we find to be reasonable allowances for 1942 and 1943, and we observe that one of the witnesses for the petitioner, H. A. Butler, in testifying about salaries paid to executives by the concern with which he was associated in 1942, 1943, and most of 1944 stated that in his concern "nobody made as much in '44 as in '43." Tr. p. 144. The evidence does not establish that despite the decreases in 1944 of the contract work which petitioner's executives supervised and carried on, there were other services rendered which entitled *82 each executive to receive in 1945 compensation equal to what each received, and, in our opinion, earned in 1943. Recognizing that weight is properly given to evidence relating to compensation paid by other concerns in the same or comparable business and that the petitioner called witnesses having knowledge of salary payments by others in the same industry, we must observe that the testimony of all of the petitioner's witnesses in reply to the questions put to them has been carefully reviewed with the following result: None of the witnesses gave clear testimony on the point of what amounts would constitute reasonable compensation of executives performing the same or similar services as petitioner's executives under the facts as they existed in the petitioner's business in 1944 and 1945, with consideration of comparisons with each preceding year. The respondent's determinations of the amounts which constituted reasonable allowances for the compensation of each executive in 1944 and 1945 are prima facie correct. The burden on the petitioner to introduce evidence which overcomes that prima facie correctness has not been satisfactorily discharged. Furthermore, upon consideration of all *83 of the evidence relating to the years 1944 and 1945 we find that reasonable allowances for the services rendered in each year are the amounts which are set forth in the findings of fact, and in so finding we are in agreement with the determinations made by the respondent. The witnesses for the petitioner failed to distinguish the facts as they existed for the petitioner in 1944 and 1945 from those existing in 1942 and 1943. Apart from the unsatisfactory aspects of such testimony, other evidence of the petitioner is vague as to the extent and amounts of the work performed by each executive in the last two years, upon which it must rely as justifying allowance of the total amounts paid to each executive in 1944 and 1945. The factual reasons which lead to the ultimate findings made as to reasonable salary allowances for 1942 and 1943 logically necessitate the findings made for 1944 and 1945 relating to the amounts of salary allowances. That is to say, the record lacks for 1944 and 1945 the substantial evidence it presents for 1942 and 1943, and a conscientious weighing of all of the evidence requires denial of petitioner's contentions for 1944 and 1945. It is held that the deductions *84 under sections 23(a)(1)(A) and (p)(1)(D) for the years involved are allowable in the respective amounts set forth as reasonable in our findings. Decision will be entered under Rule 50. Footnotes
*. Cents omitted.↩
*. Pension trust contributions in 1943 and 1944 are not included in these amounts.↩
*. Cents omitted.↩
1. The ratios of gross receipts and of gross operating profit in each of the taxable years of contracts completed in each year to total gross receipts and gross operating profit of lump sum and of cost plus fixed fee contracts were as follows: ↩
PERCENTAGE OF COMPLETED CONTRACTS
1942
1943
1944
1945
Lump
Cost
Lump
Cost
Lump
Cost
Lump
Cost
Sum
Plus
Sum
Plus
Sum
Plus
Sum
Plus
Gross Receipts
36.00%
64.00%
82.00%
18.00%
94.88%
5.12%
95.04%
4.96%
Gross Operating Profit
77.78%
22.22%
96.72%
3.28%
96.12%
3.88%
95.27%
4.73%
*. Comparison of each year is made with the preceding year. ↩
**. Gross operating profit is before executives' salaries, administrative expenses, and taxes. Decrease is in parentheses.↩
2. The six uncompleted contracts in progress at the end of 1942 and the bid amounts thereof were as follows: ↩
1. Camp Van Doren, Centerville, Miss.
Housing
$ 5,482,559
2. Camp Shelby, Hattiesburg, Miss.
Hospitals
1,748,746
3. New Orleans Airport
Hutments
220,538
4. Lake Charles Army Flying School
Housing
49,132
5. Harding Field, Baton Rouge
Ward Building
17,207
6. Camp Polk, Leesville, La.
Hospital
208,614
3. The 19 uncompleted contracts in progress at the end of 1943 and the bid amounts thereof were as follows: ↩
1. Naval Air Station, N.O.
$ 172,364
2. War Housing, Orange, Texas
3,295,063
3. War Housing, Orange, Texas
$ 847,280
4. Water Tank, Orange, Texas
127,800
5. Store Building, Orange, Texas
13,840
6. Infirmary, Orange, Texas
64,237
7. Housing, Port Arthur, Texas
151,975
8. Housing, Pascagoula, Miss.
1,178,212
9. WAVE Barracks
121,760
10. Natatorium, Naval Reserve Air Base
112,168
11. Two Barracks
72,883
12. Gun docks, Gulfport, Miss.
19,799
13. LaGarde Hospital, N.O.
24,386
14. Algiers Warehouse
290,078
15. Barracks, Naval Station, Algiers
88,388
16. Brigade Guard House
87,677
17. Brigade Guard House, Algiers
80,138
18. Housing, Higgins, La.
195,949
19. Housing #2, Higgins, La.
665,130
4. The 30 uncompleted contracts in progress at the end of 1944 and the bid amounts thereof were as follows: ↩
New Orleans office: 1. Bldg. Naval Sta., Algiers, La.
$ 208,133
2. Bldgs. Naval Sta., Algiers, La.
289,330
3. St. Catherine Bldg., Metairie
18,789
4. Bldg. Navy Depot, Orange, Texas
28,667
5. High School, Pascagoula, Miss.
183,123
6. Levee, Chalmette, La.
19,144
7. Reynolds Alloy Co., Sheffield, Ala.
4,729
8. Nurses Home, Gadsden, Ala.
182,314
9. Baptist Bible Inst., New Orleans
50,000
10. Baptist Hospital, New Orleans
175,000
11. Reynolds Alloy Co., Sheffield, Ala.
16,173
12. Reynolds Alloy Co., Sheffield, Ala.
4,602
13. I. C. Railroad, New Orleans
26,613
14. Community Bldg., New Orleans
37,486
15. Gulf Distilling Co., Gretna, La.
32,598
16. Penny Arcade Bldg., New Orleans
43,391
17. Hospital, Tuskeegee Inst.
279,285
18. Reynolds Alloy, Sheffield, Ala.
53,300
19. N. S. Engineers, Beiras, La.
73,645
20. Moisant Airport Bldgs.
227,952
21. Consolidated Vultee Co.
117,910
22. Naval Repair Base, New Orleans
55,702
Houston office: 1. Navy Hospital, Houston
138,761
2. War Housing, Orange, Texas
109,373
3. City of Houston
18,547
4. War Housing, Orange, Texas
88,576
5. City of Houston
104,854
6. City of Sweeney, Texas
106,469
7. Paving Work, Harris County, Texas
204,430
8. Paving Work, Wharton County, Texas
194,752
5. The 17 uncompleted contracts on hand at the end of 1945 and the bid amounts thereof were as follows: ↩
New Orleans office: 1. Dillard University, New Orleans
$ 103,650
2. Dillard University, New Orleans
16,853
3. Flintkote Co., New Orleans
$ 366,988
4. Commercial Bldg., New Orleans
20,372
5. Factory, So. Pecan Co., New Or-
leans
58,668
6. Flintkote Co., New Orleans
106,401
7. Commercial Bldgs., New Orleans
24,750
8. Theatre Bldg., New Orleans
$ 39,943
9. Veteran's Bldg., Kentucky
1,550,500
10. Sanitarium, Baton Rouge
165,838
Houston office: 1. City of Houston
95,570
2. City of Houston
97,039
3. City of Houston
$ 149,509
4. City of Houston
69,563
5. U.S.A. Hospital, Texas
200,387
6. U.S.A. Kelly Field, Texas
315,089
7. School, Houston
65,293
*. Cost Plus Contracts. ↩
**. Bid in 1941. ↩
***. The gross profit in 1942 from cost plus contracts amounted to $210,187.95, as compared to $735,841.46, gross profit from lump sum contracts, or only 22.22% of total profits.↩
**. Bid in 1942. ↩
*. Cost Plus Contracts. ↩
***. The gross profit in 1943 from cost plus contracts amounted to $88,604.31, as compared to $2,609,117.98, gross profit from lump sum contracts, or only 3.28% of total profits.↩
*. Cost Plus Contracts. ↩
**. Bid in 1943. ↩
***. The gross profit in 1944 from cost plus contracts amounted to $52,167.83, as compared to $1,292,526.65, gross profits from lump sum contracts, or only 3.88% of total profits.↩
**. Bid in 1944. ↩
*. Cost Plus Contracts. ↩
***. The gross profit from cost plus contracts amounted to $25,322.01, compared to $510,357.20, profit from lump sum contracts, or only 4.73% of gross profit.↩
6. ↩
1942
Awarded
Not Awarded
Total
Contract
$196,344,750
$22,933,634
$42,568,385
Site
8,186,313
25,109,880
33,296,194
Pricing
8,478,593
32,607,971
41,086,564
1943
Contract
11,867,869
4,854,039
16,721,909
Site
13,574,795
8,032,381
21,607,177
Pricing
12,854,476
11,541,554
24,396,031
1944
Contract
2,822,678
40,668,249
43,490,927
Site
2,941,558
41,395,637
44,337,195
Pricing
3,120,710
41,745,549
44,866,259
1945
Contract
3,312,230
26,783,227
30,095,457
Site
3,501,591
27,651,473
31,153,064
Pricing
3,454,736
29,061,453
32,516,189
*. Cash - $336.73. ↩
**. Also, stock dividends 2,084 shares.↩